**TRI–STATE DEVELOPERS, INC., et al., Appellants,**

**v.**

**DuRan MOORE et al., Appellees.**

Court of Appeals of Kentucky.

March 3, 1961.

Baird & Hays, Pikeville, G. M. Castle, Harlan, for appellants.

Combs & Combs, Prestonsburg, Cordell H. Martin, Hindman, for appellees.

PALMORE, Judge.

Tri-State Developers, Incorporated, a Kentucky corporation, and H. Nick Johnson, its president, appeal from a $10,180.34 judgment entered against them jointly and severally in a suit for breach of contract brought by the appellees, DuRan Moore and Hollie Conley. Trial was had by the court without a jury, and the judgment followed findings of fact in favor of the appellees as against Johnson's version of the events giving rise to the litigation.

In December of 1955 Miners Memorial Hospital Association needed housing for doctors employed at its hospital in Floyd County. Moore and Conley agreed with the Association to acquire and construct on a site at Drift four houses and rent them for this purpose. A representative of the hos-

pital told them he knew of a company at Harlan that dealt in prefabricated homes, and he arranged a conference for them with Johnson. Johnson, a realtor and insurance agent in Harlan, and one Ray Richmond, a sales representative of Lester Brothers, Inc., of Martinsville, Virginia, manufacturer of "Lesco" prefabricated homes, had recently incorporated Tri-State Developers, Inc., for the purpose of dealing in real estate "and constructing homes and business structures for sale, rental or lease."

Moore and Conley met with Johnson and Richmond in Johnson's office at Harlan on or about December 24, 1955. After looking over plans and sketches of the various Lesco homes Moore and Conley went with Richmond to see such a house or houses theretofore erected at Cumberland. They tentatively agreed with Richmond on the purchase and construction of four homes, and Richmond arranged to view the proposed building site at Drift within the next few days. Richmond went to Floyd County and inspected the property on December 31, 1955, and at this time, acting for Tri-State, orally agreed to furnish and build the homes for a total consideration of $45,400. Moore and Conley paid $400, the amount necessary to secure the plans from Lester Brothers, Inc., to bind the deal. Richmond next visited Floyd County on January 19, 1956, at which time the contract was reduced to writing.

The contract was a brief document, signed by Moore, Conley, and "Tri-State Developers, Inc., By: Ray Richmond," in which the obligations of Tri-State were as follows:

> "The parties [sic] of the second part hereby agree to construct the said four houses, two of which will be built according to Lesco Plans K–1255 in brick veneer, and the other two said houses to be built according to Lesco Plans C–960 in brick veneer with full size basement, knotty pine panelled rooms to be finished in each of the two basements.

·"It is further agreed that the Tri-State Developers, Inc., will complete said houses on a turn-key job basis, it is further agreed that the said houses, weather conditions permitting will be completed by April 1, 1956, that being the date that the lease of the parties of the first part with the United Mine Workers Hospital Association becomes effective."

The contract did not specify a time or times for payment, but this is the manner in which it was actually handled: Lester Brothers had to be paid for the "packages" as they were ordered out, and for that purpose Moore and Conley, over the period of January 20 to February 28, 1956, gave to Richmond four bank checks payable to Tri-State in the amounts of $7,255 each, totaling $29,020. Johnson received these payments and submitted the orders to Lester Brothers. Richmond personally supervised the construction project at Drift, and as the labor and other incidental expenses fell due Moore and Conley drew checks in favor of Tri-State, delivering them to Richmond, or, in several instances, made direct payments for labor and materials on Richmond's approval.

Came the first of April and the houses were not finished. Moore and Conley saw that the money would run out before the job could be completed. Richmond had faded from the picture. It appears that Lester Brothers, who did not approve of their sales representatives' engaging on the side in the construction business, had learned of his connection with Tri-State and replaced him. Johnson, too, had decided he didn't want him and, since Richmond had not put any money into the organization either at or since its incorporation, had severed connections with him. In this state of affairs Moore and Conley telephoned Johnson, with whom they had not been in direct contact since the first meeting on December 24, 1955, and advised him that the contract had not been carried out. Johnson denied knowledge of any contract except to furnish the prefabricated "packages" from Lester Brothers, but in a meeting with Moore and Conley at Prestonsburg during the first week of April agreed that he would nevertheless see to it that the job was completed in order that his or Tri-State's business reputation would not be damaged. On his return to Harlan he executed, unilaterally, a "supplementary agreement" in the name of Tri-State undertaking "to honor and make good" the contract of January 19, 1956, and "to expediate [sic] the completion of the four dwellings within thirty (3) [sic] working days from this date," the date being April 7, 1956.

Moore and Conley accepted Johnson's assurances and permitted him to continue the construction with a new supervisor and a working crew of his own. But on May 15, 1956, the job was still unfinished and the work lagging, and at this time they assumed control of the project and caused it to be completed on or about June 15, 1956. This action followed, and the $10,180.34 judgment represents amounts expended by them over and above the original contract price of $45,400. They were denied recovery of $560 for one month's lost rents resulting from the delay in completion of the houses.

■ The personal judgment against Johnson rests on two theories. First, the court found that in the course of his meeting with Moore and Conley early in April of 1956 he gave them his individual assurance that the contract would be carried out, and that Moore and Conley, relying on this, extended the time for completion and desisted from then treating the contract as breached. We think, however, that their silence on receiving the supplemental agreement executed solely by the corporation precludes them from now claiming a reliance on Johnson himself. They are estopped to deny that they accepted this agreement, which in turn had the effect of merging whatever may have been the parol understandings leading up to it.

■ The second ground on which Johnson's personal liability is predicated is that

at the time of conducting the transaction with Moore and Conley the corporation had not complied with KRS 271.095. This statute provides generally that a corporation organized under Chapter 271 shall not incur debts or begin the transaction of business until, inter alia, the first board of directors has been elected and the amount of capital with which, according to its articles, it will begin business has been fully paid in; and that if the corporation transacts any business in violation of this injunction the officers who participate in it, together with non-dissenting directors, shall be liable for the resulting debts of the corporation.

Tri-State's articles of incorporation were executed on October 20, 1955, by H. Nick Johnson, T. R. Richmond, Thos. R. Harp and Paul Saylor as incorporators, with an authorized capital of 100 shares of common stock of the par value of $100 each. They showed Johnson and Richmond as holders of 49 shares each and Harp and Saylor one share each, thus indicating 100% subscription of the $10,000 authorized capital. It was recited that the paid-in capital at the beginning of business would be $1,000, the minimum prescribed by KRS 271.085. The Secretary of State issued a certificate of incorporation on October 25, 1955.

According to its records the corporation's first meeting of stockholders was held on January 2, 1956. Richmond was not present. Johnson, Harp, Saylor, and Pauline S. Brock (Johnson's secretary) were named as directors, with Johnson as president. At a second meeting of the shareholders, held on January 9, 1956, the minutes recite that 10 shares of stock were to be issued, 5 to Johnson, 3 to Harp and one each to Saylor and Mrs. Brock, "as soon as payment therefor has been received." The same directors were again elected at this meeting. Testifying later as secretary of the corporation, Mrs. Brock said that the only payment ever received for any of its stock was Johnson's $500, and Johnson himself testified that he had purchased only 5 shares. Whether, under the circumstances, either of these meetings

properly could be termed or have effect as a stockholders' meeting is questionable, but in any event it is clear that the $1,000 in beginning capital required by KRS 271.085 and specified in the articles was never paid in.

■ A bank account had been opened in the name of the corporation on September 22, 1955, with a deposit of $1,000, apparently a loan evidenced by a note in that amount payable to Johnson. At least 12 more deposits, some in substantial amounts, were made during the remainder of 1955 as the business got under way without benefit of the corporate formalities required by KRS 271.095. None of these assets, however, constituted "capital" within the meaning of the statutes under discussion. "When used with respect to the property of a corporation or association, the term has a settled meaning; it applies only to the property, or means contributed by the stockholders as the fund or basis for the business or enterprise for which the corporation or association was formed." Bailey v. Clark, 1895, 21 Wall. 284, 88 U.S. 284, 22 L.Ed. 651; 18 C.J.S. Corporations § 193b, p. 616. See also Graham v. Louisville Transit Co., Ky.1951, 243 S.W.2d 1019, 28 A.L.R.2d 1171.

It is important to note here that we are not concerned with the question of whether the corporation had a *de facto* or *de jure* existence, if, indeed, the distinction could have any significance in this type of case anyway. Corporate status is conceded. See KRS 271.065. Nor do we have a case in which the contractees looked to the corporate representatives as individuals, because Moore and Conley were fully advised at the original meeting with Johnson and Richmond on December 24, 1955, that they were dealing with a corporation. The personal liability of Johnson therefore does not rest on traditional common law principles, but on the express statutory provision of KRS 271.095(2).

■ The state extends to the members of a corporation organized under Chapter

271 personal immunity from corporate liabilities, but only if and when the requirements of KRS 271.095 are satisfied. Those requirements are quite minimal. Anyone can launch a corporate enterprise with $1,000. It may seem harsh that personal immunity should be withheld for a mere $1,000 (in this case $500), but that is a legislative prerogative, and we can find no lesser meaning in the plain words of the statute. One may start business on a shoestring in Kentucky, but if it is a corporate business the shoestring must be worth $1,000.

■ Johnson contended that Richmond was never authorized to make the contract of January 19, 1956, in the name of the corporation, and that he did not know of its existence until April. Nonetheless, by the supplemental agreement of April 7, 1956, he essentially ratified it for the corporation, and still the $1,000 minimum capital had never been paid in, so if he had not been liable before that time he certainly became so then. We have considered the possibility that since no stock had been issued at the time the officers and directors were "elected" Johnson never properly became an officer or director, and thus could not be liable under KRS 271.095(2), but the theory is not tenable. Those who purport to act for a corporation before its governing body is legally constituted must be held its de facto officers for the simple reason that otherwise they could act indefinitely with complete impunity, without ever meeting the requirements of KRS 271.095. We conclude that the trial court did not err in adjudging Johnson personally liable on the contract.

■ Having disposed of this most nettlesome aspect of the case, we proceed to the essential merits of the claim itself. Here it is argued that there should be no recovery because, by assuming control of the construction project on May 15, 1956, without notice to Tri-State, Moore and Conley prevented Tri-State from completing it. It will be recalled, however, that on April 7, 1956, Tri-State had agreed to "expediate" the completion of the four dwellings within 30 working days. The fair import of that commitment was to finish the job within 30 working days after April 7. On May 15 the project was substantially short of completion and work had been lagging. On several days recently prior to that date no work was done. The workmen complained that they were not being paid. Time was of material importance, so known to all the parties. Under the circumstances Moore and Conley were justified in treating the contract as breached and in completing the work themselves.

The appellants sharply question numerous items of damages, representing $7,267.42 of the $10,180.34 total allowed in the judgment. These items may be roughly classified into four categories, (1) expenditures on landscaping, sidewalks, and other features not covered by the Lesco specifications, (2) interest in the amount of $495 paid the Bank Josephine on money borrowed by Moore and Conley, (3) $1,000 charged by Moore and Conley for their own services in supervising the completion, and (4) the $13 clerk's filing fee and $4 paid the sheriff for serving summons in this proceeding.

■ As to the first (and monetarily most important) of these categories, the justification for their allowance rests largely on the contemporary construction placed on the contract by the parties during the period of supervision by Richmond. Lester Brothers, Inc., manufacturer of the prefabricated houses, is not in the construction business. Hence its plans do not embrace such matters as drives, sidewalks, landscaping and seeding. These things do, however, go with the so-called "turn-key" job of a construction contractor, and they must be provided for as a condition to obtaining a VA or FHA loan. Therefore, depending on what the buyer of a Lesco home plans in these respects, Lester Brothers, Inc., customarily furnishes with each set of its plans a bill of materials filled out in detail on the standard VA or FHA form.

This document is provided as a courtesy. It is not a part of the Lesco house plans. Therefore, say the appellants, the VA "Description of Materials" furnished with each of the four sets of plans in this case was not a part of the contract. But we think it is clear that these additional documents were treated by the parties as a part of the loosely-drawn contract and were correctly so construed by the trial court.

 Though interest paid the Bank Josephine on money borrowed in order to complete the houses on and after May 15 might qualify as necessary and recoverable expense incurred by Moore and Conley in order to mitigate the damages resulting from the breach of contract, the proof did not segregate that portion of the interest from the interest attributable to a large loan theretofore extended to Moore and Conley by the bank in order to finance the $45,400 outlay originally contemplated by the contract. Therefore, it was improperly allowed. In this connection, the allowance of interest on the amount of recovery from the time the claim matured (discussed infra) effectually covers and reimburses the interest charges incurred by Moore and Conley as a result of the breach.

The $1,000 supervisory charge allowed Moore and Conley did not represent any actual loss or expense to them and should not have been included in the judgment. Obviously the allowance of paid court costs as part of the damages was erroneous. Though recoverable anyway, costs are in a separate category from the damages and would, in this case, bear interest from a different date.

Interest on the amount of damages awarded by the judgment was allowed from April 1, 1956. It is within the discretion of the trial court to award interest on the amount adjudged due on account of an unliquidated claim. Congoleum-Nairn v. M. Livingston & Co., 1935, 257 Ky. 573, 78 S.W.2d 781, 785; Restatement, Contracts, § 337. However, since in this case the amount of Moore and Conley's claim was not ascertainable until they had finished the job on June 15, 1956, we think it was an abuse of discretion to adjudge interest before that date.

Moore and Conley lost one month's rent by reason of Tri-State's failure to complete performance of the contract within the time extended by the supplemental agreement of April 7, 1956. The sum of $560 proved on that account should have been allowed. Though it was not brought up by cross-appeal, in adjusting the items of damage erroneously adjudged against the appellants the trial court may credit that amount to Moore and Conley.

The judgment is affirmed except as to the amount of damages and interest thereon, and is reversed in that respect with directions that it be modified in accordance with the views expressed in this opinion.