BSY-COMPANY, Inc., Appellant,

v.

FUEL ECONOMY ENGINEERING COMPA-
NY, Inc., and Superior Risk Insurance
Company, Inc., Appellees.

Court of Appeals of Kentucky.

Nov. 19, 1965.

Rehearing Denied March 11, 1966.

Charles C. Adams, Norma B. Adams, Adams & Adams, C. Homer Neikirk, Fritz Krueger, Somerset, for appellant.

John G. Prather, Don E. Cooper, Somerset, Linn J. Firestone, St. Paul, Minn., for appellees.

DAVIS, Commissioner.

BSY Company, Inc., appellant, (hereinafter BSY) seeks to reverse a judgment obtained against it by Fuel Economy Engineering Company, Inc., appellee, (hereinafter Fuel) in a sum slightly in excess of $16,000 for claimed breach of contract. Superior Risk Insurance Company is named as an appellee because it is the corporate surety on Fuel's general contract bond. Before noting the questions raised we shall outline the facts.

Fuel had the prime contract for construction of the substructure and underground foundation of a portion of Cooper Power Station near Burnside. In February, 1962, Fuel entered into a subcontract with BSY, by the terms of which BSY undertook to perform the excavation portion of the prime contract. In May, 1962, Fuel gave BSY the subcontract for the supply and delivery of concrete for the substructure construction. We shall refer to these contracts as the excavation contract and the materials contract, respectively.

When the excavation contract was executed BSY made known to Fuel that BSY was unable to provide a performance bond as required by the contract. (No bond was made for the materials contract either.) BSY also explained to executives of Fuel that the capital of BSY was limited, but representatives of BSY assured Fuel's people that BSY would be able to handle the work. The stated price to be paid BSY for performance of the original excavation contract was $67,000—based on the average depths for excavations shown on the bid drawings; certain modifications of the original excavation contract were made when excavations disclosed theretofore unknown conditions. Payments under the excavation contract were to be paid upon submitted estimates of work performed at thirty-day intervals, with a provision for 10% retention on each payment.

BSY began work under the excavation contract in April, 1962, and quite shortly thereafter BSY called on Fuel for money. No estimate was submitted. Fuel's employee, Cain, made a trip to the job site to inspect the work, at which time he was advised by Sparks, one of BSY's principals, that BSY was "rapidly running short of money." Cain visited BSY's home office in West Virginia, where he and Sparks went over the fiscal affairs of BSY. Fuel then advanced $5,000 to BSY, on April 24, 1962, although no contract payment could have accrued prior to May 15. BSY continued to make requests of Fuel for money as the work progressed, but before payments were due by the contractual terms. Fuel complied with these requests by paying substantial sums to BSY, so that by late July, 1962, Fuel had already paid $43,645 to BSY, all payments being applicable to the excavation contract.

For BSY, Sparks visited the home office of Fuel in St. Paul, Minnesota, about August 1, 1962. Several conferences were held between Sparks and Fuel's representatives. Sparks estimated that BSY had already performed excavation work sufficient to earn $70,000, but Fuel's estimates indicated that only about $43,000 was due— or slightly less than had been paid already. (The wide variance between their estimates resulted from their different approaches in computing the value of yards excavated, some of which were compensable and some were not.) Sparks advised Fuel's men that BSY's bank account was virtually depleted, and that bills of more than $12,500 were outstanding against BSY on accounts incurred by BSY incident to the work performed. Sparks expressed doubt that BSY could obtain any additional financing to enable it to carry forward the contract work.

For Fuel it was explained to Sparks that Fuel could not and would not advance payments in excess of the sums earned by performance, but a "way out" was suggested whereby Fuel would "take over" the work and complete it for BSY. This proposal envisioned that Fuel would use BSY's equipment, and retain Sparks to look after the work. Other BSY employees were to leave the job site. Fuel was to make the installment payments on BSY's equipment as they accrued, and after the project was completed Fuel was to restore the equipment to BSY. Sparks indicated his assent to this arrangement, but expressed the need to discuss it with his co-owners before final execution of the agreement. A draft of the proposal was prepared at St. Paul and taken by Sparks to the other principals in BSY, but it was never signed. Sparks requested Fuel to advance $2,828.15 to meet the currently due BSY payroll; Fuel advanced the sum, believing that the proposed "take over" by Fuel would ensue in course.

Work was not started on the materials contract until late July, 1962. Concrete had been delivered by BSY in an amount sufficient to entitle BSY to $5,022, although no estimate for payment of this had been submitted at the time of the St. Paul meeting. Fuel had already had inquiries about BSY's delinquencies in payments due on a "travel batcher" cement plant required for completion of the materials contract. Threats of repossession were being made by the vendor of the equipment, and this was brought to the attention of Sparks by Fuel before the St. Paul meeting.

After the St. Paul talks, BSY's employees did not leave the site; upon telephone inquiry from St. Paul Fuel learned from Sparks that BSY had decided against the "take over" agreement. Then Fuel stopped payment on the $2,828.15 check it had given BSY to meet payroll payments due. (Later Fuel "made good" the payroll checks which BSY had drawn against that uncollected item.) Fuel notified BSY by telegraph and letter that the contracts were terminated.

Fuel then filed suit in Pulaski Circuit Court asking that BSY be required to vacate the job site. The suit was ended by an agreed order by which BSY agreed to leave the premises, but without prejudice to its claims under the contracts with Fuel.

Fuel then proceeded with the work under both contracts. After completion of the work, Fuel instituted this suit asserting that BSY owed Fuel more than $100,000 because of Fuel's outlay in performing the remainder of BSY's contracts.

By answer and counterclaim BSY denied any breach of either contract and asserted damages aggregating $148,328.21 because of Fuel's breach of the contracts, plus $100,000 punitive damages. BSY also sought nearly $6,500 as claimed loss on account of an alleged improper sale of the concrete "travel batcher" under a conditional sales agreement. Other collateral matters were presented and resolved, but are not involved in this appeal. The respective claims of Fuel and BSY were tried before a jury; BSY did not introduce any proof, nor did it cross examine any witness, although its counsel repeatedly "reserved" the right to cross examine. At the conclusion of Fuel's proof BSY made a motion for a directed verdict which was overruled. Upon the failure of BSY to offer proof the trial court directed a verdict for Fuel in the sum of $16,184.91; judgment went accordingly and this appeal followed.

Appellant asserts reversible error was committed by denying its motion for a peremptory; by granting a peremptory for Fuel; by refusal to permit BSY to introduce proof, and by failure to permit the jury to determine factual issues in respect to the performance of the contracts.

 Each of the contracts contained a provision requiring BSY to pay for all materials, skill, labor and instrumentalities used in performance of the contract, " * * when and as bills or claims therefor become due, and to save and protect the premises, the Owner and the Contractor

from all claims and mechanics' liens on account thereof \* \* \*." It is clear that BSY had not complied with that provision in either contract, although no lien claim had been filed by any creditor of BSY when Fuel ousted BSY from the job. It is our view that the evidence of BSY's failure to comply with its obligation to keep current its bills, coupled with the several statements by Sparks of BSY to Fuel that BSY's financial situation was dark, warranted Fuel's action in pulling BSY off the job. Clearly, Fuel could not be expected to stand by and permit BSY to incur even greater indebtedness, for all of which Fuel bore a potential responsibility under its prime contract. We hold, therefore, that BSY was not entitled to a peremptory instruction. There was sufficient evidence to show a breach of both contracts by BSY, and these breaches were of such significance as to warrant Fuel's action. Cf., Tri-State Developers, Inc. v. Moore, Ky., 343 S.W.2d 812.

■ Appellant points to the doctrine requiring construction of a contract most strongly against the drafter of the document. We can perceive no basis for comfort to appellant in that doctrine, since there is nothing in the agreement authorizing BSY's failure to keep current its obligations.

■ Appellant contends that Fuel waived strict performance by BSY so far as the "bill-paying" clause was concerned. The thrust of this argument is that Fuel lulled BSY into believing that this portion of the contract would not be enforced because Fuel waived the performance bond and advanced monies to BSY ahead of the contractual payment schedule. Supporting that theory appellant cites Green River Steel Corp. v. Globe Erection Co., Ky., 294 S.W.2d 507, and Stamper v. Ford's Adm'x., Ky., 260 S.W.2d 942. We have no quarrel with those authorities, but find them inapplicable here. From the outset Fuel traveled the "extra mile" for BSY, but it

was made plain to BSY at the St. Paul meeting that the worsening situation could not be extended. We find no merit in this contention.

■ BSY asserts that Fuel failed to comply with KRS 355.9–504 when Fuel bought the repossessed travel batcher without notice to BSY of the time and place of the proposed sale. The difficulty of this is that Fuel showed that it had bought the lien paper on the batcher from BSY's vendor, and had "bought" the batcher by giving BSY credit for the entire purchase price of the batcher. In other words, BSY obtained credit as if the used batcher had sold for the exact amount BSY had paid for it. BSY made no offer of proof that the batcher had a value greater than paid by Fuel. Under these conditions the acquisition by Fuel was commercially reasonable. KRS 355.9–504(3).

■ Complaint is made that the trial court granted a peremptory instruction for Fuel. We are at a loss to understand what else the trial court could have done in light of the failure of BSY to offer any evidence. Further complaint is made that the trial court refused to permit BSY to offer evidence but this assertion is not supported by the record before us. There is no showing that BSY sought to present testimony, and the judgment of the trial court recites that BSY offered no proof. Certainly BSY cannot complain that the trial court limited Fuel's recovery to $16,184.91 since the evidence for Fuel would have warranted a greater sum. Fuel may have had some ground of complaint in that regard, but not BSY.

■ Finally, BSY argues that it was a jury question whether BSY had performed according to the terms of the contract. In support of this BSY relies on Thoroughbred Motor Court v. Allen Company, Ky., 296 S.W.2d 690; Hartford Accident & Indemnity Co. v. Middlesboro-LaFollette Bus

Line, Inc., Ky., 357 S.W.2d 671; Meem-Haskins Coal Corp. v. Pratt, 299 Ky. 767, 187 S.W.2d 435. But the cited cases do not stand for the proposition urged here. In Thoroughbred Motor Court the jury questions related to whether the contractor had performed in a workmanlike manner; no such question appears here. In the latter two cases just cited the litigation arose from *oral* agreements, and the parties presented conflicting evidence as to the terms of the agreements. Manifestly a jury issue arose in those cases as to what the *terms* of the agreements were, but that is not so here.

The judgment is affirmed.