DISSENT
MERRITT, Circuit Judge, dissenting.
The basic claims by the plaintiff sisters against their brothers, Dennis and Griffy, have been litigated since the sisters first sued the brothers 27 years ago. I do not agree with my colleagues’ disposition of this case because: (1) the parties settled the same basic claims in 1993; (2) even if the claims are not completely barred by the settlement agreement, the claims are equitable in nature and the doctrine of laches should foreclose damages after a reasonable time following the time when the sisters learned of their brothers’ earlier breach of fiduciary duties; (3) under any circumstances, the damages ($584 million, nearly half of which are in the form of prejudgment interest at 8% compounded annually for approximately three decades) approved by our court are excessive, unreasonable, and probably in violation of due process.
I.
A very simple point should end this litigation: Between 1990 and 1993, the parties *466 before us now litigated the very same claims presented in this case now—25 years later. The 1990 action was a stockholder’s derivative suit; it claimed that the brothers engaged in fraud, breach of fiduciary duty, and misconduct as chief officers of the corporation created by their father. The sisters’ claims arose from the same basic facts presented in this case. The major difference is that the corporation was much smaller 25 years ago, less valuable, and had not been sold. The record does not reveal what the circumstances of the corporation were a generation ago or what led to the increase in value to $840 million. The sisters and their families have apparently already received some monies as a result of the sale.
The plaintiff sisters and the defendant brothers settled their lawsuit in September 1993, and the parties—including each of the sisters—signed the settlement agreement. The settlement agreement clearly releases the brothers in exchange for consideration. The brothers brought pressure to bear on their sisters by paying them money and demonstrating anger and sorrow about the family disagreement. In exchange for $10,000 each, the sisters released “any and all claims ... of any kind or nature whatsoever which any of the Griffin siblings may have had or may now have, regardless of whether known or unknown,” against the two brothers. The district court immediately conducted a fairness hearing on the settlement agreement and contemporaneously concluded that the settlement was fair. It approved the settlement and entered judgment dismissing the plaintiffs’ claims with prejudice.
My colleagues argue 25 years later that the settlement agreement is unenforceable because the defendant brothers’ anger violated fiduciary duties that continued even after the litigation. My colleagues apparently believe that the brothers had a fiduciary duty to encourage the sisters to reject the settlement offer “precisely because [the sisters] continued to trust them.” This so-called brotherly “fiduciary duty” to discourage settlement between litigating parties is indeed strange since the parties were engaged on opposite sides of a lawsuit in which the sisters claimed serious wrongdoing by the brothers. The law normally encourages the settlement of lawsuits. See Fed. R. Civ. P. 16(a)(5) (concerning “facilitating settlement”); Fed. R. Civ. P. 16 advisory committee’s notes (citing extensive authorities that encourage settlement); In re NLO, Inc., 5 F.3d 154, 157 (6th Cir. 1993). The parties here were adversaries in court, not fiduciaries. The fact that 25 years later the corporation is worth hundreds of millions of dollars more in the marketplace is not a valid basis for setting aside an agreed-upon and judicially approved settlement agreement many years later. The settlement agreement 25 years ago arising from the same basic claims should, therefore, stand as a bar to these claims. My colleagues’ rule would make it impossible to settle breach-of-fiduciary-duty lawsuits once they are filed—a rule directly contrary to the normal policy of the law encouraging settlement.
In deciding this case, we must remember that hundreds of thousands of settlements every year terminate legal disputes. This court and other trial and appellate courts at the federal and state level employ settlement lawyers who seek to settle cases. Lawyers themselves, outside of the judicial process, settle many disputes before they become lawsuits. Settlements often depend on significant pressures to settle brought to bear by judges, mediators, adversaries, family members, the press and many others. Here, a federal judge intervened to conduct a fairness hearing and to put his seal of approval on the settlement.-The elder brothers may have *467 brought pressure to bear on their sisters— by paying them each $10,000 or by exhibiting anger or sorrow—but I do not find anything that would justify refusing to enforce the settlement several decades later. There must be hundreds of thousands of cases in which similar types of pressure induced settlement. See John Barkai & Elizabeth Kent, Let’s Stop Spreading Rumors About Settlement and Litigation: A Comparative Study of Settlement and Litigation in Hawaii Courts, 29 Ohio St. J. Disp. Resol. 85, 135-39 (2014) (estimating between 50% and 60% of lawsuits are settled nationwide). In my view, my colleagues’ holding here establishes a very bad precedent that the judicial system cannot live with if applied elsewhere.
The alternative arguments below apply only if the settlement agreement is not dispositive of the case. In my view, the settlement agreement should be enforced. In that case, the two alternative arguments below need not be considered and should be pretermitted.
II.
The district court should have applied the doctrine of laches in this case. That doctrine significantly reduces the long period for which the district court awarded damages, including its award of interest at 8% compounded annually for decades.
The plaintiff sisters’ action against their brothers was an equitable proceeding for breach of fiduciary duty arising from the brothers’ conduct as trustees of their father’s family trust after their appointment in November 1985. In such equitable proceedings, the more flexible doctrine of laches applies rather than the strict rules governing statutes of limitation. Kentucky’s highest court has established the following more-flexible standard for laches:
Ordinarily, actual knowledge on the part of the complainant, of the alleged invasion of his rights of which he complains, is necessary in order to charge him with laches. However, knowledge may in some circumstances be imputed to him by reason of opportunity to acquire knowledge, or where it appears that he could have informed himself of the facts by the exercise of reasonable diligence, or where the circumstances were such as to put a man of ordinary prudence on inquiry.
Taylor v. Kentucky, 302 S.W.2d 583, 584 (Ky. 1957) (emphasis added).
The district court’s own findings when it dismissed the plaintiff sisters’ RICO claim should be conclusive on the issue of laches. With regard to the same conduct, the district court found that the sisters had an “opportunity to acquire knowledge” of the brothers’ wrongful conduct and that the sisters had failed to exercise “reasonable diligence” regarding the warnings that they had received regarding the brothers’ conduct as trustees. The district court concluded that the plaintiffs had many opportunities to “acquire knowledge” of their brothers’ breach of fiduciary duty and that they were on notice of facts that would “put a man [or woman] of ordinary prudence on inquiry.” The district court found as a fact that “the Holt plaintiffs were aware that [their sister] Betsy had filed a lawsuit against Dennis and Griffy just months before the closure of [their] Mother’s probate estate.” The district court went on to say that “even accepting plaintiffs’ contention that Dennis and Griffy dissuaded them from inquiring into the substance of Betsy’s claims—which itself should arguably have alerted plaintiffs to the possibility that Dennis and Griffy were being less than candid with them—it is undisputed that plaintiffs could easily have obtained Betsy’s complaint, which was a public record from the time of its filing....” The district court found that *468 plaintiffs were at fault because “they admittedly took no action, however, to look into the matter further, even after defendants demanded that they sign the 1993 settlement agreement [for Betsy’s and their own derivative case] without disclosing its terms.”
There were additional reasons as well that the sisters should have been on notice that the brothers were not treating them fairly. The sisters claim that Dennis threw a copy of their mother’s will at them, refused to answer questions about their mother’s estate, and refused to let them see the settlement documents he directed them to sign. Previously, in 1985, plaintiff Cynthia Roeder’s husband told her and her sister, Betsy, that they were being “screwed” by the brothers. Betsy repeatedly wárned the Holt plaintiffs to obtain copies of their mother’s estate documents. Nevertheless, the sisters remained willfully ignorant of their brothers’ conduct.
Had the sisters insisted that they be shown the 1993 settlement agreement they signed, they would have read that the purpose of the agreement was “[t]o settle the derivative claim against Griffin Industries in the Lawsuit and any tort claims that could have been asserted by the Griffin Siblings against Dennis Griffin, John M. Griffin and Robert Griffin based on [their] conduct in their capacities as officers and directors of Griffin Industries.” Similarly, the 1993 agreement provided:
Although the Defendants deny any wrongdoing and liability to any of the Griffin Siblings, the Defendants acknowledge that the pleadings in the Lawsuit alleged tort claims against Dennis Griffin and John M. Griffin based on their conduct in their capacities as officers and directors of Griffin Industries and that such conduct is alleged to have resulted in personal injury and caused consequential damages....
These provisions of the settlement agreement make clear that Betsy’s original suit accused Dennis and Griffy of tortious malfeasance in their capacities as directors of Griffin Industries. It seems to me that “reasonable diligence” would have required the sisters to insist upon being shown the text of the settlement agreement before signing it, especially in light of Dennis and Griffy’s erratic behavior in connection with the administration of the mother’s estate. Had the sisters examined the agreement, they would have learned of the nature of Betsy’s claims against the brothers. Coupled with the brothers’ behavior, those facts would have been sufficient to put a reasonable person on notice of his or her potential claims against the brothers.
If the enforcement of the settlement agreement does not end the case, I would vacate the judgment and remand the case to the district court with instructions to apply the doctrine of laches from September 10, 1993, the date that the Holt plaintiffs would have learned of the substance of Betsy’s claims against Dennis and Griffy had they exercised reasonable diligence. Specifically, I.would instruct the district court that the Holt plaintiffs had a duty to inquire into their brothers’ conduct after they signed the 1993 settlement agreement and they received checks for $10,000 from Griffin Industries marked “derivative.” That date represents the latest possible moment they could have reasonably relied upon their brothers’ characterizations of the dispute with Betsy.
III.
The district court also failed to calculate the. damages and the prejudgment interest in this case with the degree of specificity required under Kentucky law. Accordingly, *469 I would remand the case for further fact-finding and reconsideration of both amounts if the settlement agreement is not enforced.
A.
With respect to its calculation of the damages associated with the defendants’ breach of fiduciary duty, the district court erred in not reducing the plaintiffs’ recovery by the amount that the brothers paid directly to the IRS in satisfaction of the tax liability associated with Griffin Industries’ yearly earnings. I would remand the case for further fact-finding on that question.
“Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.” Pauline’s Chicken Villa, Inc. v. KFC Corp., 701 S.W.2d 399, 401 (Ky. 1985) (quoting Restatement (Second) Contracts § 352). Kentucky’s requirement of reasonable certainty does not require absolute mathematical precision when calculating an award of damages, but it does require that the finder of fact take cognizance of ascertainable facts that “eliminate virtually all the uncertain variables.” Id. This rule squares with the “bottom principle of the law of damages” in Kentucky, which is that compensatory damages are designed “[t]o restore the party injured, as near as may be, to his former position.” Hughett v. Caldwell Cty., 313 Ky. 85, 230 S.W.2d 92, 96 (1950), abrogated on other grounds by Harrod Concrete & Stone Co. v. Crutcher, 458 S.W.3d 290 (Ky. 2015).
The district court’s damages calculation does not meet this standard of specificity in light of its failure to account for disbursements that were made to Griffin Industries’ stockholders to cover the tax liability associated with Griffin Industries’ earnings as a subchapter-S corporation. The evidence at trial showed that Griffin Industries has elected to be taxed under Subchapter S of Chapter 1 of the Internal Revenue Code at all relevant times. So-called “S corporations” are taxed at the shareholder level as opposed to the corporate level. Put another way, the S corporation does not pay taxes on its yearly earnings; rather, its shareholders are responsible for paying the taxes associated with the corporation’s earnings. According to expert testimony at trial and consistent with the common practice of S corporations, Griffin Industries would make annual disbursements to its shareholders in order to cover the tax liability associated with the corporation’s earnings for the year; the shareholders would then forward those disbursements directly to the Internal Revenue Service. Despite the fact that the plaintiff sisters would have been required to send all tax-related disbursements along to the IRS, the district court calculated the damages on the basis of all disbursements made between 1985 and 2010 without accounting for or seeking proof regarding the portion of those disbursements that were made in satisfaction of Griffin Industries’ tax liability. Indeed, the district court specifically refused to consider evidence of taxes paid by Griffin Industries stockholders over the relevant time period. After a cross-examination of the plaintiffs’ damages expert about his failure to account for the disbursements that were made to the shareholders to satisfy their tax liability on Griffin Industries, the district court squarely held that it “would not make any attempt to figure out everybody’s taxes” despite the defendants’ request that the court account for the disbursements made to cover the stockholders’ tax liability on the S corporation. The district court’s failure to consider proof of the tax liability resulted in a windfall to the plaintiffs; they were awarded compensation (and 8% interest over 30 *470 years) for disbursements that would not have inured to their benefit even absent the defendants’ breach of fiduciary duty.
I would hold that the district court’s damages award has not been established with the “reasonable certainty” required under Kentucky law because it does not include an offset for the money that the sisters would have been obliged to remit to the IRS. Accordingly, I would remand the case for further fact-finding regarding the proportion of the disbursements that were made in order to satisfy Griffin Industries’ tax liability between 1985 and 2010 if the settlement agreement is not enforceable.
B.
The district court also abused its discretion in awarding prejudgment interest on unliquidated damages at the highest rate authorized by law over a period of nearly thirty years. I would reverse the district court’s decision to award prejudgment interest.
In cases involving unliquidated damages, the award of prejudgment interest rests within the discretion of the trial .court. Nucor Corp. v. Gen. Elec. Co., 812 S.W.2d 136, 145 (Ky. 1991). Kentucky law disfavors—but does not disallow—the award of prejudgment interest in cases involving unliquidated damages. See Ronald W. Eades, Kentucky Law of Damages § 7:9 (2017). To that end, the highest court in Kentucky has repeatedly cautioned that it is an abuse of discretion to award prejudgment interest on unliquidated claims for time before the damages are “ascertainable.” Tri-State Developers, Inc. v. Moore, 343 S.W.2d 812, 817 (Ky. 1961). In broad strokes, damages are not “ascertainable” until the defendants have notice of the final amount of damages associated with their alleged breach. See id. (holding damages associated with a late and over-budget construction project were not “ascertainable” until the contractor had finished construction on the project). This limitation on prejudgment interest is especially important when, as here, the plaintiff has “delayed in filing suit.” Nucor Corp., 812 S.W.2d at 144 (quoting Restatement (Second) of Torts § 913 cmt. a).
Here, the damages were not “ascertainable” until 2010, when the sisters filed their claims in the district court. The damages associated with Dennis and Griffy’s wrongdoing accrued on an ongoing basis under the district court’s chosen remedy of “equitable disgorgement,”[1] so the precise amount of the damages in this case remained unknown until the plaintiffs filed their claims against the defendants. In ' that way, the facts here are analogous to those in the Tri-State Developers case de *471 cided by Kentucky’s highest court. In TriState, the Court of Appeals of Kentucky rejected a plaintiffs claim that the damages associated with a late and over-budget construction project were ascertainable before the completion of the project. Tri-State Developers, 343 S.W.2d at 817. The court supported its finding on nonascer-tainability by reasoning that the defendants could not have anticipated the amount of the judgment against them— and, consequently, their liability for prejudgment interest—until they completed the project. See id. Similarly, the defendant brothers could not have anticipated the size of the judgment in this case until 2010 at the very earliest. Thus, the damages in this ease were not ascertainable until 2010 and the district court’s award of hundreds of millions of dollars in prejudgment interest for the preceding 25 years was an abuse of discretion under Kentucky law. I would reverse the district court’s award of prejudgment interest for the time prior to 2010.
IV.
Finally, I am skeptical of the constitutionality of the district court’s award of prejudgment interest in excess of $250 million on a compensatory award of approximately $330 million. This case raises due process concerns because the circumstances suggest that the award of prejudgment interest was intended more to punish the defendants than to compensate the plaintiffs for the time-value of the disbursements involved in this case. Indeed, the district court recognized that applying an 8% annual return “would probably be higher” than returns on the market over the 30 years before its judgment, noting that “a treasury bill [was then] paying one percent.” Despite its recognition of that fact, the court awarded interest at the 8% level used by the plaintiffs’ expert without any explanation or effort to determine “the market rate of interest” over the same period. It seems clear that the district court intended to do more than compensate the sisters for the time-value of their damages awards when it applied an 8% prejudgment interest rate, so I presume the award of prejudgment interest was intended, at least in part, as a sort of punishment for the defendants’ wrongful acts.
Civil damages awards imposed as punishment for a defendant’s wrongful actions are subject to scrutiny under the Due Process Clause of the Fifth Amendment.[2] See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416-18, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574-75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Specifically, the Constitution prohibits the imposition award of “grossly excessive or arbitrary” punitive damages. Campbell, 538 U.S. at 416-17, 123 S.Ct. 1513. When assessing whether an award of damages is grossly excessive or arbitrary, courts examine the three “guideposts” set out in Gore: First, and most importantly, courts assess “the degree of reprehensibility of the defendant’s conduct.” Gore, 517 U.S. at 575, 116 S.Ct. 1589. Second, we examine the ratio of the compensatory damages award to the punitive damages award. Id. Third, we compare the punitive damages award to “civil penalties authorized or imposed in comparable cases.” Id. None of these factors is dispositive; rather, they are balanced against one another in determining whether an award of punitive damages is grossly excessive.
*472 Assuming that the same standard is applicable in a case where ostensibly compensatory remedies are used to punish the defendant rather than to compensate the plaintiff, I am skeptical that this award comports with due process. While it is true that the brothers’ abuse of their sisters’ trust was wrongful, it is also true that the sisters did not exercise the diligence we expect of reasonable people when it came to protecting their interests after they were informed of Betsy’s grievances with Dennis and Griffy. The ratio between the compensatory damages and the punitive damages in this case is particularly troublesome. On an award of $830 million in damages, the plaintiffs recovered nearly the same sum in prejudgment interest. The Supreme Court has previously noted that in cases, like this one, involving extremely high compensatory awards, imposition of punitive damages at even a 1-to-l ratio can be constitutionally problematic. Campbell, 538 U.S. at 425, 123 S.Ct. 1513. The final Gore factor does not weigh in favor of a finding-of unconstitutionality as Kentucky law permits imposition of a civil monetary penalty of up to double the defendant’s gain in a case involving felony theft by deception. Ky. Rev. Stat. §§ 514.040 (defining theft by deception), 534.030 (setting default monetary fines in felony cases) (2017). While these factors appear to be largely in equipoise, the comparative size of the judgment compared with the award of prejudgment interest coupled with the sisters’ failure to exercise reasonable diligence leave me doubtful of the constitutionality of the district court’s award of prejudgment interest.
For the reasons articulated above, I respectfully dissent.

. The idea of “equitable disgorgement” is a doctrine of a very recent vintage used in SEC fraud cases, primarily in the Second Circuit. See SEC v. Cavanagh, 445 F.3d 105, 116-20 (2d Cir. 2006). The doctrine is used to'remove unlawful gains from insider traders because such cases do not cause damages to any discrete plaintiffs. The theory is not applicable to cases of this kind in which there are identifiable victims with a right to recover damages. Indeed, the theory may not even be applicable in SEC contexts for much longer in light of the Supreme Court’s recent opinion on the matter. See Kokesh v. SEC, - U.S. -, 137 S.Ct. 1635, 1642 n.3, 198 L.Ed.2d 86 (2017) ("Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context.”).
I am glad my colleagues are happy to stand with Lord Coke, Blackstone, Justice Story, and other distinguished lawyers on this matter, but those famous men would never have heard of "equitable disgorgement.” Rather, they would have understood that the Lord Chancellor retained power to award money damages in cases involving a breach of fiduciary duty. See Colleen P. Murphy, Misclassifying Monetary Restitution, 55 SMU L. Rev. 1577, 1598-1600 (2002).

. The Supreme Court has never expressly held that the same due process standards articulated under the Fourteenth Amendment are applicable to the federal government under the Fifth Amendment, but the clear language and reasoning of Gore and Campbell suggest that the same standards should govern a federal court’s award of damages as punishment for a defendant’s wrongful conduct.