# STATE FARM MUTUAL AUTOMOBILE INSURANCE CO. *v.* CAMPBELL ET AL.

No. 01–1289.   Argued December 11, 2002—Decided April 7, 2003

410

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SOUTER, and BREYER, JJ., joined. SCALIA, J., *post*, p. 429, THOMAS, J., *post*, p. 429, and GINSBURG, J., *post*, p. 430, filed dissenting opinions.

*Sheila L. Birnbaum* argued the cause for petitioner. With her on the briefs were *Barbara Wrubel, Douglas W. Dunham,* and *Ellen P. Quackenbos.*

*Laurence H. Tribe* argued the cause for respondents. With him on the brief were *Kenneth Chesebro, Jonathan S. Massey, Roger P. Christensen,* and *Karra J. Porter.**

*Briefs of *amici curiae* urging reversal were filed for the Alliance of American Insurers et al. by *Mark F. Horning, Charles G. Cole,* and *Bennett Evan Cooper;* for the American Council of Life Insurers by *William F. Sheehan* and *Victoria E. Fimea;* for the American Tort Reform Association by *Roy T. Englert, Jr.,* and *Alan E. Untereiner;* for the Business Roundtable by *Malcolm E. Wheeler;* for the Chamber of Commerce of the United States by *Andrew L. Frey, Andrew H. Schapiro, Evan M. Tager,* and *Robin S. Conrad;* for Common Good by *Philip K. Howard, Robert A. Long, Jr.,* and *Keith A. Noreika;* for the Defense Research Institute by *Patrick Lysaught;* for Ford Motor Co. by *Theodore J. Boutrous, Jr., Miguel A. Estrada, John M. Thomas,* and *Michael J. O'Reilly;* for the Health Insurance Association of America et al. by *Robert N. Weiner* and *Nancy L. Perkins;* for the International Mass Retail Association et al. by *Daniel H. Bromberg, Robert J. Verdisco, David F. Zoll,* and *Donald D. Evans;* for the National Association of Manufacturers by *Carter G. Phillips, Gene C. Schaerr, Richard D. Bernstein, Stephen B. Kinnaird, Jan S. Amundson,* and *Quentin Riegel;* for the National Conference of Insurance Legislators by *Patrick Lynch;* for the Product Liability Advisory Council, Inc., by

JUSTICE KENNEDY delivered the opinion of the Court.

We address once again the measure of punishment, by means of punitive damages, a State may impose upon a defendant in a civil case. The question is whether, in the circumstances we shall recount, an award of $145 million in punitive damages, where full compensatory damages are $1 million, is excessive and in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

## I

In 1981, Curtis Campbell (Campbell) was driving with his wife, Inez Preece Campbell, in Cache County, Utah. He decided to pass six vans traveling ahead of them on a two-lane highway. Todd Ospital was driving a small car approaching from the opposite direction. To avoid a head-on collision with Campbell, who by then was driving on the wrong side of the highway and toward oncoming traffic, Ospital swerved onto the shoulder, lost control of his automobile, and col-

*Victor E. Schwartz* and *Leah Lorber;* for the Washington Legal Foundation et al. by *Arvin Maskin, Daniel J. Popeo,* and *Paul D. Kamenar;* and for A. Mitchell Polinsky et al. by *Dan M. Kahan.*

Briefs of *amici curiae* urging affirmance were filed for the State of Minnesota et al. by *Mike Hatch,* Attorney General of Minnesota, and by the Attorneys General for their respective States as follows: *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Frankie Sue Del Papa* of Nevada, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, and *Sheldon Whitehouse* of Rhode Island; for the Association of Trial Lawyers of America by *Jeffrey Robert White;* for the California Consumer Health Care Council, Inc., by *Eugene R. Anderson* and *Daniel Healy;* for Certain Leading Social Scientists et al. by *Paul M. Simmons* and *William M. Shernoff;* and for Keith N. Hylton by *Garry B. Bryant.*

Briefs of *amici curiae* were filed for Abbott Laboratories et al. by *Walter Dellinger;* for DeKalb Genetics Corp. by *Seth P. Waxman* and *David W. Ogden;* and for the Truck Insurance Exchange et al. by *Ellis J. Horvitz, S. Thomas Todd,* and *Mary-Christine Sungaila.*

lided with a vehicle driven by Robert G. Slusher. Ospital was killed, and Slusher was rendered permanently disabled. The Campbells escaped unscathed.

In the ensuing wrongful death and tort action, Campbell insisted he was not at fault. Early investigations did support differing conclusions as to who caused the accident, but "a consensus was reached early on by the investigators and witnesses that Mr. Campbell's unsafe pass had indeed caused the crash." 65 P. 3d 1134, 1141 (Utah 2001). Campbell's insurance company, petitioner State Farm Mutual Automobile Insurance Company (State Farm), nonetheless decided to contest liability and declined offers by Slusher and Ospital's estate (Ospital) to settle the claims for the policy limit of $50,000 ($25,000 per claimant). State Farm also ignored the advice of one of its own investigators and took the case to trial, assuring the Campbells that "their assets were safe, that they had no liability for the accident, that [State Farm] would represent their interests, and that they did not need to procure separate counsel." *Id.*, at 1142. To the contrary, a jury determined that Campbell was 100 percent at fault, and a judgment was returned for $185,849, far more than the amount offered in settlement.

At first State Farm refused to cover the $135,849 in excess liability. Its counsel made this clear to the Campbells: "'You may want to put for sale signs on your property to get things moving.'" *Ibid.* Nor was State Farm willing to post a supersedeas bond to allow Campbell to appeal the judgment against him. Campbell obtained his own counsel to appeal the verdict. During the pendency of the appeal, in late 1984, Slusher, Ospital, and the Campbells reached an agreement whereby Slusher and Ospital agreed not to seek satisfaction of their claims against the Campbells. In exchange the Campbells agreed to pursue a bad-faith action against State Farm and to be represented by Slusher's and Ospital's attorneys. The Campbells also agreed that Slusher and Ospital would have a right to play a part in all major decisions con-

cerning the bad-faith action. No settlement could be concluded without Slusher's and Ospital's approval, and Slusher and Ospital would receive 90 percent of any verdict against State Farm.

In 1989, the Utah Supreme Court denied Campbell's appeal in the wrongful-death and tort actions. *Slusher* v. *Ospital,* 777 P. 2d 437. State Farm then paid the entire judgment, including the amounts in excess of the policy limits. The Campbells nonetheless filed a complaint against State Farm alleging bad faith, fraud, and intentional infliction of emotional distress. The trial court initially granted State Farm's motion for summary judgment because State Farm had paid the excess verdict, but that ruling was reversed on appeal. 840 P. 2d 130 (Utah App. 1992). On remand State Farm moved *in limine* to exclude evidence of alleged conduct that occurred in unrelated cases outside of Utah, but the trial court denied the motion. At State Farm's request the trial court bifurcated the trial into two phases conducted before different juries. In the first phase the jury determined that State Farm's decision not to settle was unreasonable because there was a substantial likelihood of an excess verdict.

Before the second phase of the action against State Farm we decided *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559 (1996), and refused to sustain a $2 million punitive damages award which accompanied a verdict of only $4,000 in compensatory damages. Based on that decision, State Farm again moved for the exclusion of evidence of dissimilar out-of-state conduct. App. to Pet. for Cert. 168a–172a. The trial court denied State Farm's motion. *Id.,* at 189a.

The second phase addressed State Farm's liability for fraud and intentional infliction of emotional distress, as well as compensatory and punitive damages. The Utah Supreme Court aptly characterized this phase of the trial:

"State Farm argued during phase II that its decision to take the case to trial was an 'honest mistake' that did

not warrant punitive damages. In contrast, the Campbells introduced evidence that State Farm's decision to take the case to trial was a result of a national scheme to meet corporate fiscal goals by capping payouts on claims company wide. This scheme was referred to as State Farm's 'Performance, Planning and Review,' or PP & R, policy. To prove the existence of this scheme, the trial court allowed the Campbells to introduce extensive expert testimony regarding fraudulent practices by State Farm in its nation-wide operations. Although State Farm moved prior to phase II of the trial for the exclusion of such evidence and continued to object to it at trial, the trial court ruled that such evidence was admissible to determine whether State Farm's conduct in the Campbell case was indeed intentional and sufficiently egregious to warrant punitive damages." 65 P. 3d, at 1143.

Evidence pertaining to the PP&R policy concerned State Farm's business practices for over 20 years in numerous States. Most of these practices bore no relation to third-party automobile insurance claims, the type of claim underlying the Campbells' complaint against the company. The jury awarded the Campbells $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million respectively. Both parties appealed.

The Utah Supreme Court sought to apply the three guideposts we identified in *Gore, supra,* at 574–575, and it reinstated the $145 million punitive damages award. Relying in large part on the extensive evidence concerning the PP&R policy, the court concluded State Farm's conduct was reprehensible. The court also relied upon State Farm's "massive wealth" and on testimony indicating that "State Farm's actions, because of their clandestine nature, will be punished at most in one out of every 50,000 cases as a matter of statistical probability," 65 P. 3d, at 1153, and concluded that the ratio

between punitive and compensatory damages was not unwarranted. Finally, the court noted that the punitive damages award was not excessive when compared to various civil and criminal penalties State Farm could have faced, including $10,000 for each act of fraud, the suspension of its license to conduct business in Utah, the disgorgement of profits, and imprisonment. *Id.*, at 1154–1155. We granted certiorari. 535 U. S. 1111 (2002).

## II

We recognized in *Cooper Industries, Inc.* v. *Leatherman Tool Group, Inc.*, 532 U. S. 424 (2001), that in our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decisionmaker, serve different purposes. *Id.*, at 432. Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Ibid.* (citing Restatement (Second) of Torts § 903, pp. 453–454 (1979)). By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution. *Cooper Industries, supra,* at 432; see also *Gore, supra,* at 568 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"); *Pacific Mut. Life Ins. Co.* v. *Haslip,* 499 U. S. 1, 19 (1991) ("[P]unitive damages are imposed for purposes of retribution and deterrence").

While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards. *Cooper Industries, supra; Gore, supra,* at 559; *Honda Motor Co.* v. *Oberg,* 512 U. S. 415 (1994); *TXO Production Corp.* v. *Alliance Resources Corp.,* 509 U. S. 443 (1993); *Haslip, supra.* The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. *Cooper Industries, supra,* at 433; *Gore,* 517 U. S., at 562; see also *id.,* at 587 (BREYER, J., concurring) ("This constitutional concern, itself

harkening back to the Magna Carta, arises out of the basic unfairness of depriving citizens of life, liberty, or property, through the application, not of law and legal processes, but of arbitrary coercion"). The reason is that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id.*, at 574; *Cooper Industries, supra,* at 433 ("Despite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion"). To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property. *Haslip, supra,* at 42 (O'CONNOR, J., dissenting) ("Punitive damages are a powerful weapon. Imposed wisely and with restraint, they have the potential to advance legitimate state interests. Imposed indiscriminately, however, they have a devastating potential for harm. Regrettably, common-law procedures for awarding punitive damages fall into the latter category").

Although these awards serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding. This increases our concerns over the imprecise manner in which punitive damages systems are administered. We have admonished that "[p]unitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." *Honda Motor, supra,* at 432; see also *Haslip, supra,* at 59 (O'CONNOR, J., dissenting) ("[T]he Due Process Clause

does not permit a State to classify arbitrariness as a virtue. Indeed, the point of due process—of the law in general—is to allow citizens to order their behavior. A State can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim"). Our concerns are heightened when the decisionmaker is presented, as we shall discuss, with evidence that has little bearing as to the amount of punitive damages that should be awarded. Vague instructions, or those that merely inform the jury to avoid "passion or prejudice," App. to Pet. for Cert. 108a–109a, do little to aid the decisionmaker in its task of assigning appropriate weight to evidence that is relevant and evidence that is tangential or only inflammatory.

In light of these concerns, in *Gore, supra,* we instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.,* at 575. We reiterated the importance of these three guideposts in *Cooper Industries* and mandated appellate courts to conduct *de novo* review of a trial court's application of them to the jury's award. 532 U. S. 424. Exacting appellate review ensures that an award of punitive damages is based upon an "'application of law, rather than a decisionmaker's caprice.'" *Id.,* at 436 (quoting *Gore, supra,* at 587 (BREYER, J., concurring)).

## III

Under the principles outlined in *BMW of North America, Inc.* v. *Gore,* this case is neither close nor difficult. It was error to reinstate the jury's $145 million punitive damages award. We address each guidepost of *Gore* in some detail.

## A

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U. S., at 575. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.*, at 576–577. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. *Id.*, at 575.

Applying these factors in the instant case, we must acknowledge that State Farm's handling of the claims against the Campbells merits no praise. The trial court found that State Farm's employees altered the company's records to make Campbell appear less culpable. State Farm disregarded the overwhelming likelihood of liability and the near-certain probability that, by taking the case to trial, a judgment in excess of the policy limits would be awarded. State Farm amplified. the harm by at first assuring the Campbells their assets would be safe from any verdict and by later telling them, postjudgment, to put a for-sale sign on their house. While we do not suggest there was error in awarding punitive damages based upon State Farm's conduct toward the Campbells, a more modest punishment for this

reprehensible conduct could have satisfied the State's legitimate objectives, and the Utah courts should have gone no further.

This case, instead, was used as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country. The Utah Supreme Court's opinion makes explicit that State Farm was being condemned for its nationwide policies rather than for the conduct directed toward the Campbells. 65 P. 3d, at 1143 ("[T]he Campbells introduced evidence that State Farm's decision to take the case to trial was a result of a national scheme to meet corporate fiscal goals by capping payouts on claims company wide"). This was, as well, an explicit rationale of the trial court's decision in approving the award, though reduced from $145 million to $25 million. App. to Pet. for Cert. 120a ("[T]he Campbells demonstrated, through the testimony of State Farm employees who had worked outside of Utah, and through expert testimony, that this pattern of claims adjustment under the PP&R program was not a local anomaly, but was a consistent, nationwide feature of State Farm's business operations, orchestrated from the highest levels of corporate management").

The Campbells contend that State Farm has only itself to blame for the reliance upon dissimilar and out-of-state conduct evidence. The record does not support this contention. From their opening statements onward the Campbells framed this case as a chance to rebuke State Farm for its nationwide activities. App. 208 ("You're going to hear evidence that even the insurance commission in Utah and around the country are unwilling or inept at protecting people against abuses"); id., at 242 ("[T]his is a very important case. . . . [I]t transcends the Campbell file. It involves a nationwide practice. And you, here, are going to be evaluating and assessing, and hopefully requiring State Farm to stand accountable for what it's doing across the country, which is the purpose of punitive damages"). This was a po-

sition maintained throughout the litigation. In opposing State Farm's motion to exclude such evidence under *Gore,* the Campbells' counsel convinced the trial court that there was no limitation on the scope of evidence that could be considered under our precedents. App. to Pet. for Cert. 172a ("As I read the case *[Gore]*, I was struck with the fact that a clear message in the case . . . seems to be that courts in punitive damages cases should receive more evidence, not less. And that the court seems to be inviting an even broader area of evidence than the current rulings of the court would indicate"); *id.,* at 189a (trial court ruling).

A State cannot punish a defendant for conduct that may have been lawful where it occurred. *Gore, supra,* at 572; *Bigelow* v. *Virginia,* 421 U. S. 809, 824 (1975) ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State"); *New York Life Ins. Co.* v. *Head,* 234 U. S. 149, 161 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends. This is so obviously the necessary result of the Constitution that it has rarely been called in question and hence authorities directly dealing with it do not abound"); *Huntington* v. *Attrill,* 146 U. S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of other States"). Nor, as a general rule, does a State have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction. Any proper adjudication of conduct that occurred outside Utah to other persons would require their inclusion, and, to those parties, the Utah courts, in the usual case, would need

to apply the laws of their relevant jurisdiction. *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 821–822 (1985).

Here, the Campbells do not dispute that much of the out-of-state conduct was lawful where it occurred. They argue, however, that such evidence was not the primary basis for the punitive damages award and was relevant to the extent it demonstrated, in a general sense, State Farm's motive against its insured. Brief for Respondents 46–47 ("[E]ven if the practices described by State Farm were not malum in se or malum prohibitum, they became relevant to punitive damages to the extent they were used as tools to implement State Farm's wrongful PP&R policy"). This argument misses the mark. Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff. A jury must be instructed, furthermore, that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred. *Gore*, 517 U. S., at 572–573 (noting that a State "does not have the power . . . to punish [a defendant] for conduct that was lawful where it occurred and that had no impact on [the State] or its residents"). A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction. *Id.*, at 569 ("[T]he States need not, and in fact do not, provide such protection in a uniform manner").

For a more fundamental reason, however, the Utah courts erred in relying upon this and other evidence: The courts awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive dam-

ages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis, but we have no doubt the Utah Supreme Court did that here. 65 P. 3d, at 1149 ("Even if the harm to the Campbells can be appropriately characterized as minimal, the trial court's assessment of the situation is on target: 'The harm is minor to the individual but massive in the aggregate'"). Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains. *Gore, supra,* at 593 (BREYER, J., concurring) ("Larger damages might also 'double count' by including in the punitive damages award some of the compensatory, or punitive, damages that subsequent plaintiffs would also recover").

The same reasons lead us to conclude the Utah Supreme Court's decision cannot be justified on the grounds that State Farm was a recidivist. Although "[o]ur holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance," *Gore, supra,* at 577, in the context of civil actions courts must ensure the conduct in question replicates the prior transgressions. *TXO,* 509 U. S., at 462, n. 28 (noting that courts should look to "'the existence and frequency of similar past conduct'" (quoting *Haslip,* 499 U. S., at 21–22)).

The Campbells have identified scant evidence of repeated misconduct of the sort that injured them. Nor does our review of the Utah courts' decisions convince us that State Farm was only punished for its actions toward the Campbells. Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims

that had nothing to do with a third-party lawsuit was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees. 65 P. 3d, at 1148, 1150. The Campbells attempt to justify the courts' reliance upon this unrelated testimony on the theory that each dollar of profit made by underpaying a third-party claimant is the same as a dollar made by underpaying a first-party one. Brief for Respondents 45; see also 65 P. 3d, at 1150 ("State Farm's continuing illicit practice created market disadvantages for other honest insurance companies because these practices increased profits. As plaintiffs' expert witnesses established, such wrongfully obtained competitive advantages have the potential to pressure other companies to adopt similar fraudulent tactics, or to force them out of business. Thus, such actions cause distortions throughout the insurance market and ultimately hurt all consumers"). For the reasons already stated, this argument is unconvincing. The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20-year period. In this case, because the Campbells have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis.

### B

Turning to the second *Gore* guidepost, we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. 517 U. S., at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive

award"); *TXO, supra,* at 458. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip,* in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U. S., at 23–24. We cited that 4-to-1 ratio again in *Gore.* 517 U. S., at 581. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. *Id.,* at 581, and n. 33. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, *id.,* at 582, or, in this case, of 145 to 1.

Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." *Ibid.;* see also *ibid.* (positing that a higher ratio *might* be necessary where "the injury is hard to detect or the monetary value of non-economic harm might have been difficult to determine"). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered. In the context of this case, we have no doubt that there is a presumption against an award that has a 145-to-1 ratio. The compensatory award in this case was substantial; the Campbells were awarded $1 million for a year and a half of emotional distress. This was complete compensation. The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed, so the Campbells suffered only minor economic injuries for the 18-month period in which State Farm refused to resolve the claim against them. The compensatory damages for the injury suffered here, moreover, likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element. See Restatement (Second) of Torts § 908, Comment c, p. 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both").

The Utah Supreme Court sought to justify the massive award by pointing to State Farm's purported failure to report a prior $100 million punitive damages award in Texas to its corporate headquarters; the fact that State Farm's policies have affected numerous Utah consumers; the fact that State Farm will only be punished in one out of every 50,000 cases as a matter of statistical probability; and State Farm's enormous wealth. 65 P. 3d, at 1153. Since the Supreme

Court of Utah discussed the Texas award when applying the ratio guidepost, we discuss it here. The Texas award, however, should have been analyzed in the context of the reprehensibility guidepost only. The failure of the company to report the Texas award is out-of-state conduct that, if the conduct were similar, might have had some bearing on the degree of reprehensibility, subject to the limitations we have described. Here, it was dissimilar, and of such marginal relevance that it should have been accorded little or no weight. The award was rendered in a first-party lawsuit; no judgment was entered in the case; and it was later settled for a fraction of the verdict. With respect to the Utah Supreme Court's second justification, the Campbells' inability to direct us to testimony demonstrating harm to the people of Utah (other than those directly involved in this case) indicates that the adverse effect on the State's general population was in fact minor.

The remaining premises for the Utah Supreme Court's decision bear no relation to the award's reasonableness or proportionality to the harm. They are, rather, arguments that seek to defend a departure from well-established constraints on punitive damages. While States enjoy considerable discretion in deducing when punitive damages are warranted, each award must comport with the principles set forth in *Gore*. Here the argument that State Farm will be punished in only the rare case, coupled with reference to its assets (which, of course, are what other insured parties in Utah and other States must rely upon for payment of claims) had little to do with the actual harm sustained by the Campbells. The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award. *Gore*, 517 U. S., at 585 ("The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business"); see also *id.*, at 591 (BREYER, J., concurring) ("[Wealth] provides an open-ended basis for

inflating awards when the defendant is wealthy .... That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct"). The principles set forth in *Gore* must be implemented with care, to ensure both reasonableness and proportionality.

## C

The third guidepost in *Gore* is the disparity between the punitive damages award and the "civil penalties authorized or imposed in comparable cases." *Id.*, at 575. We note that, in the past, we have also looked to criminal penalties that could be imposed. *Id.*, at 583; *Haslip*, 499 U. S., at 23. The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award.

Here, we need not dwell long on this guidepost. The most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud, 65 P. 3d, at 1154, an amount dwarfed by the $145 million punitive damages award. The Supreme Court of Utah speculated about the loss of State Farm's business license, the disgorgement of profits, and possible imprisonment, but here again its references were to the broad fraudulent scheme drawn from evidence of out-of-state and dissimilar conduct. This analysis was insufficient to justify the award.

## IV

An application of the *Gore* guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages. The punitive award of $145 million, therefore, was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant. The proper calculation of punitive damages under the principles we have discussed should be resolved, in the first instance, by the Utah courts.

The judgment of the Utah Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, dissenting.

I adhere to the view expressed in my dissenting opinion in *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559, 598–599 (1996), that the Due Process Clause provides no substantive protections against "excessive" or "'unreasonable'" awards of punitive damages. I am also of the view that the punitive damages jurisprudence which has sprung forth from *BMW* v. *Gore* is insusceptible of principled application; accordingly, I do not feel justified in giving the case *stare decisis* effect. See *id.*, at 599. I would affirm the judgment of the Utah Supreme Court.

JUSTICE THOMAS, dissenting.

I would affirm the judgment below because "I continue to believe that the Constitution does not constrain the size of punitive damages awards." *Cooper Industries, Inc.* v. *Leatherman Tool Group, Inc.*, 532 U. S. 424, 443 (2001) (THOMAS, J., concurring) (citing *BMW of North America,*

*Inc.* v. *Gore,* 517 U. S. 559, 599 (1996) (SCALIA, J., joined by THOMAS, J., dissenting)). Accordingly, I respectfully dissent.

JUSTICE GINSBURG, dissenting.

Not long ago, this Court was hesitant to impose a federal check on state-court judgments awarding punitive damages. In *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.,* 492 U. S. 257 (1989), the Court held that neither the Excessive Fines Clause of the Eighth Amendment nor federal common law circumscribed awards of punitive damages in civil cases between private parties. *Id.,* at 262–276, 277–280. Two years later, in *Pacific Mut. Life Ins. Co.* v. *Haslip,* 499 U. S. 1 (1991), the Court observed that "unlimited jury [or judicial] discretion . . . in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities," *id.,* at 18; the Due Process Clause, the Court suggested, would attend to those sensibilities and guard against unreasonable awards, *id.,* at 17–24. Nevertheless, the Court upheld a punitive damages award in *Haslip* "more than 4 times the amount of compensatory damages, . . . more than 200 times [the plaintiff's] out-of-pocket expenses," and "much in excess of the fine that could be imposed." *Id.,* at 23. And in *TXO Production Corp.* v. *Alliance Resources Corp.,* 509 U. S. 443 (1993), the Court affirmed a state-court award "526 times greater than the actual damages awarded by the jury." *Id.,* at 453;[1] cf. *Browning-Ferris,* 492 U. S., at 262 (ratio of punitive to compensatory damages over 100 to 1).

It was not until 1996, in *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559, that the Court, for the first time, invalidated a state-court punitive damages assessment as un-

---

[1] By switching the focus from the ratio of punitive to compensatory damages to the potential loss to the plaintiffs had the defendant succeeded in its illicit scheme, the Court could describe the relevant ratio in *TXO* as 10 to 1. See *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559, 581, and n. 34 (1996).

reasonably large. See *id.*, at 599 (SCALIA, J., dissenting). If our activity in this domain is now "well established," see *ante,* at 416, 427, it takes place on ground not long held.

In *Gore,* I stated why I resisted the Court's foray into punitive damages "territory traditionally within the States' domain." 517 U. S., at 612 (dissenting opinion). I adhere to those views, and note again that, unlike federal habeas corpus review of state-court convictions under 28 U. S. C. § 2254, the Court "work[s] at this business [of checking state courts] alone," unaided by the participation of federal district courts and courts of appeals. 517 U. S., at 613. It was once recognized that "the laws of the particular State must suffice [to superintend punitive damages awards] until judges or legislators authorized to do so initiate system-wide change." *Haslip,* 499 U. S., at 42 (KENNEDY, J., concurring in judgment). I would adhere to that traditional view.

## I

The large size of the award upheld by the Utah Supreme Court in this case indicates why damages-capping legislation may be altogether fitting and proper. Neither the amount of the award nor the trial record, however, justifies this Court's substitution of its judgment for that of Utah's competent decisionmakers. In this regard, I count it significant that, on the key criterion "reprehensibility," there is a good deal more to the story than the Court's abbreviated account tells.

Ample evidence allowed the jury to find that State Farm's treatment of the Campbells typified its "Performance, Planning and Review" (PP&R) program; implemented by top management in 1979, the program had "the explicit objective of using the claims-adjustment process as a profit center." App. to Pet. for Cert. 116a. "[T]he Campbells presented considerable evidence," the trial court noted, documenting "that the PP&R program . . . has functioned, and continues to function, as an unlawful scheme . . . to deny benefits owed consumers by paying out less than fair value in order to meet

preset, arbitrary payout targets designed to enhance corporate profits." *Id.*, at 118a–119a. That policy, the trial court observed, was encompassing in scope; it "applied equally to the handling of both third-party and first-party claims." *Id.*, at 119a. But cf. *ante*, at 423–424, 427 (suggesting that State Farm's handling of first-party claims has "nothing to do with a third-party lawsuit").

Evidence the jury could credit demonstrated that the PP&R program regularly and adversely affected Utah residents. Ray Summers, "the adjuster who handled the Campbell case and who was a State Farm employee in Utah for almost twenty years," described several methods used by State Farm to deny claimants fair benefits, for example, "falsifying or withholding of evidence in claim files." App. to Pet. for Cert. 121a. A common tactic, Summers recounted, was to "unjustly attac[k] the character, reputation and credibility of a claimant and mak[e] notations to that effect in the claim file to create prejudice in the event the claim ever came before a jury." *Id.*, at 130a (internal quotation marks omitted). State Farm manager Bob Noxon, Summers testified, resorted to a tactic of this order in the Campbell case when he "instruct[ed] Summers to write in the file that Todd Ospital (who was killed in the accident) was speeding because he was on his way to see a pregnant girlfriend." *Ibid.* In truth, "[t]here was no pregnant girlfriend." *Ibid.* Expert testimony noted by the trial court described these tactics as "completely improper." *Ibid.*

The trial court also noted the testimony of two Utah State Farm employees, Felix Jensen and Samantha Bird, both of whom recalled "intolerable" and "recurrent" pressure to reduce payouts below fair value. *Id.*, at 119a (internal quotation marks omitted). When Jensen complained to top managers, he was told to "get out of the kitchen" if he could not take the heat; Bird was told she should be "more of a team player." *Ibid.* (internal quotation marks omitted). At times, Bird said, she "was forced to commit dishonest acts

and to knowingly underpay claims." *Id.*, at 120a. Eventually, Bird quit. *Ibid.* Utah managers superior to Bird, the evidence indicated, were improperly influenced by the PP&R program to encourage insurance underpayments. For example, several documents evaluating the performance of managers Noxon and Brown "contained explicit preset average payout goals." *Ibid.*

Regarding liability for verdicts in excess of policy limits, the trial court referred to a State Farm document titled the "Excess Liability Handbook"; written before the Campbell accident, the handbook instructed adjusters to pad files with "self-serving" documents, and to leave critical items out of files, for example, evaluations of the insured's exposure. *Id.*, at 127a–128a (internal quotation marks omitted). Divisional superintendent Bill Brown used the handbook to train Utah employees. *Id.*, at 134a. While overseeing the Campbell case, Brown ordered adjuster Summers to change the portions of his report indicating that Mr. Campbell was likely at fault and that the settlement cost was correspondingly high. *Id.*, at 3a. The Campbells' case, according to expert testimony the trial court recited, "was a classic example of State Farm's application of the improper practices taught in the Excess Liability Handbook." *Id.*, at 128a.

The trial court further determined that the jury could find State Farm's policy "deliberately crafted" to prey on consumers who would be unlikely to defend themselves. *Id.*, at 122a. In this regard, the trial court noted the testimony of several former State Farm employees affirming that they were trained to target "the weakest of the herd"—"the elderly, the poor, and other consumers who are least knowledgeable about their rights and thus most vulnerable to trickery or deceit, or who have little money and hence have no real alternative but to accept an inadequate offer to settle a claim at much less than fair value." *Ibid.* (internal quotation marks omitted).

The Campbells themselves could be placed within the "weakest of the herd" category. The couple appeared economically vulnerable and emotionally fragile. App. 3360a–3361a (Order Denying State Farm's Motion for Judgment NOV and New Trial Regarding Intentional Infliction of Emotional Distress). At the time of State Farm's wrongful conduct, "Mr. Campbell had residuary effects from a stroke and Parkinson's disease." *Id.*, at 3360a.

To further insulate itself from liability, trial evidence indicated, State Farm made "systematic" efforts to destroy internal company documents that might reveal its scheme, App. to Pet. for Cert. 123a, efforts that directly affected the Campbells, *id.*, at 124a. For example, State Farm had "a special historical department that contained a copy of all past manuals on claim-handling practices and the dates on which each section of each manual was changed." *Ibid.* Yet in discovery proceedings, State Farm failed to produce any claim-handling practice manuals for the years relevant to the Campbells' bad-faith case. *Id.*, at 124a–125a.

State Farm's inability to produce the manuals, it appeared from the evidence, was not accidental. Documents retained by former State Farm employee Samantha Bird, as well as Bird's testimony, showed that while the Campbells' case was pending, Janet Cammack, "an in-house attorney sent by top State Farm management, conducted a meeting . . . in Utah during which she instructed Utah claims management to search their offices and destroy a wide range of material of the sort that had proved damaging in bad-faith litigation in the past—in particular, old claim-handling manuals, memos, claim school notes, procedure guides and other similar documents." *Id.*, at 125a. "These orders were followed even though at least one meeting participant, Paul Short, was personally aware that these kinds of materials had been requested by the Campbells in this very case." *Ibid.*

Consistent with Bird's testimony, State Farm admitted that it destroyed every single copy of claim-handling manu-

als on file in its historical department as of 1988, even though these documents could have been preserved at minimal expense. *Ibid.* Fortuitously, the Campbells obtained a copy of the 1979 PP&R manual by subpoena from a former employee. *Id.*, at 132a. Although that manual has been requested in other cases, State Farm has never itself produced the document. *Ibid.*

"As a final, related tactic," the trial court stated, the jury could reasonably find that "in recent years State Farm has gone to extraordinary lengths to stop damaging documents from being created in the first place." *Id.*, at 126a. State Farm kept no records at all on excess verdicts in third-party cases, or on bad-faith claims or attendant verdicts. *Ibid.* State Farm alleged "that it has no record of its punitive damage payments, even though such payments must be reported to the [Internal Revenue Service] and in some states may not be used to justify rate increases." *Ibid.* Regional Vice President Buck Moskalski testified that "he would not report a punitive damage verdict in [the Campbells'] case to higher management, as such reporting was not set out as part of State Farm's management practices." *Ibid.*

State Farm's "wrongful profit and evasion schemes," the trial court underscored, were directly relevant to the Campbells' case, *id.*, at 132a:

> "The record fully supports the conclusion that the bad-faith claim handling that exposed the Campbells to an excess verdict in 1983, and resulted in severe damages to them, was a product of the unlawful profit scheme that had been put in place by top management at State Farm years earlier. The Campbells presented substantial evidence showing how State Farm's improper insistence on claims-handling employees' reducing their claim payouts . . . regardless of the merits of each claim, manifested itself . . . in the Utah claims operations during the period when the decisions were made not to offer to settle the Campbell case for the $50,000 policy limits—

indeed, not to make any offer to settle at a lower amount. This evidence established that high-level manager Bill Brown was under heavy pressure from the PP&R scheme to control indemnity payouts during the time period in question. In particular, when Brown declined to pay the excess verdict against Curtis Campbell, or even post a bond, he had a special need to keep his year-end numbers down, since the State Farm incentive scheme meant that keeping those numbers down was important to helping Brown get a much-desired transfer to Colorado. . . . There was ample evidence that the concepts taught in the Excess Liability Handbook, including the dishonest alteration and manipulation of claim files and the policy against posting any supersedeas bond for the full amount of an excess verdict, were dutifully carried out in this case. . . . There was ample basis for the jury to find that everything that had happened to the Campbells—when State Farm repeatedly refused in bad-faith to settle for the $50,000 policy limits and went to trial, and then failed to pay the 'excess' verdict, or at least post a bond, after trial—was a direct application of State Farm's overall profit scheme, operating through Brown and others." *Id.*, at 133a–134a.

State Farm's "policies and practices," the trial evidence thus bore out, were "responsible for the injuries suffered by the Campbells," and the means used to implement those policies could be found "callous, clandestine, fraudulent, and dishonest." *Id.*, at 136a; see *id.*, at 113a (finding "ample evidence" that State Farm's reprehensible corporate policies were responsible for injuring "many other Utah consumers during the past two decades"). The Utah Supreme Court, relying on the trial court's record-based recitations, understandably characterized State Farm's behavior as "egregious and malicious." *Id.*, at 18a.

## II

The Court dismisses the evidence describing and documenting State Farm's PP&R policy and practices as essentially irrelevant, bearing "no relation to the Campbells' harm." *Ante*, at 422; see *ante*, at 424 ("conduct that harmed [the Campbells] is the only conduct relevant to the reprehensibility analysis"). It is hardly apparent why that should be so. What is infirm about the Campbells' theory that their experience with State Farm exemplifies and reflects an overarching underpayment scheme, one that caused "repeated misconduct of the sort that injured them," *ante*, at 423? The Court's silence on that score is revealing: Once one recognizes that the Campbells did show "conduct by State Farm similar to that which harmed them," *ante*, at 424, it becomes impossible to shrink the reprehensibility analysis to this sole case, or to maintain, at odds with the determination of the trial court, see App. to Pet. for Cert. 113a, that "the adverse effect on the State's general population was in fact minor," *ante*, at 427.

Evidence of out-of-state conduct, the Court acknowledges, may be "probative [even if the conduct is lawful in the State where it occurred] when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious. . . ." *Ante*, at 422; cf. *ante*, at 419 (reiterating this Court's instruction that trial courts assess whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident"). "Other acts" evidence concerning practices both in and out of State was introduced in this case to show just such "deliberateness" and "culpability." The evidence was admissible, the trial court ruled: (1) to document State Farm's "reprehensible" PP&R program; and (2) to "rebut [State Farm's] assertion that [its] actions toward the Campbells were inadvertent errors or mistakes in judgment." App. 3329a (Order Denying Various Motions of State Farm to Exclude Plaintiffs' Evidence). Viewed in this light, there surely was "a nexus" between much of the "other

acts" evidence and "the specific harm suffered by [the Camp-bells]." *Ante*, at 422.

## III

When the Court first ventured to override state-court pu-nitive damages awards, it did so moderately. The Court re-called that "[i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Gore*, 517 U. S., at 568. Today's de-cision exhibits no such respect and restraint. No longer content to accord state-court judgments "a strong presump-tion of validity," *TXO*, 509 U. S., at 457, the Court announces that "few awards exceeding a single-digit ratio between pu-nitive and compensatory damages, to a significant degree, will satisfy due process." *Ante*, at 425.[2] Moreover, the Court adds, when compensatory damages are substantial, doubling those damages "can reach the outermost limit of the due process guarantee." *Ibid.*; see *ante*, at 429 ("facts of this case . . . likely would justify a punitive damages award at or near the amount of compensatory damages"). In a leg-islative scheme or a state high court's design to cap punitive damages, the handiwork in setting single-digit and 1-to-1 benchmarks could hardly be questioned; in a judicial decree imposed on the States by this Court under the banner of substantive due process, the numerical controls today's deci-sion installs seem to me boldly out of order.

\*      \*      \*

I remain of the view that this Court has no warrant to reform state law governing awards of punitive damages.

---

[2] *TXO Production Corp.* v. *Alliance Resources Corp.*, 509 U. S. 443, 462, n. 8 (1993), noted that "[u]nder well-settled law," a defendant's "wrongdo-ing in other parts of the country" and its "impressive net worth" are fac-tors "typically considered in assessing punitive damages." It remains to be seen whether, or the extent to which, today's decision will unsettle that law.

*Gore,* 517 U. S., at 607 (GINSBURG, J., dissenting). Even if I were prepared to accept the flexible guides prescribed in *Gore,* I would not join the Court's swift conversion of those guides into instructions that begin to resemble marching orders. For the reasons stated, I would leave the judgment of the Utah Supreme Court undisturbed.