**Brian W. CATT, Appellant–Defendant,**

v.

**Michael SKEANS and Cindy Skeans, Appellees–Plaintiffs.**

No. 45A03–0605–CV–196.

Court of Appeals of Indiana.

April 4, 2007.

Publication Ordered May 16, 2007.

Transfer Denied July 19, 2007

Jon Laramore, Baker & Daniels LLP, Indianapolis, IN, Michael J. Raiz, Newman Raiz, LLC, Chicago, IL, Attorneys for Appellant.

Timothy F. Kelly, Michael P. Massucci, Kelly Law Offices, Crown Point, IN, Attorneys for Appellees.

## OPINION

BAKER, Chief Judge.

Appellant-defendant Brian W. Catt appeals from the jury's award of $2,001,268.92 in compensatory damages and $500,000 in punitive damages to appellee-plaintiff Michael Skeans. Specifically, Catt argues that: (1) the trial court erred in refusing to divulge the name of a juror who observed Skeans catching some keys with his injured arm, leading to a mistrial; (2) the trial court erred in excluding evidence of Catt's finances, which are relevant to the calculation of punitive damages; (3) the punitive damages award is unconstitutionally excessive; and (4) Skeans failed to prove his lost earning capacity; consequently, the compensatory damages award is excessive. Finding no error, we affirm the judgment of the trial court.

## FACTS

On January 8, 2003, Catt arrived at a friend's house in Dolton, Illinois, around noon and began drinking whiskey. After consuming alcohol for several hours, Catt got into his vehicle and began to drive to his home in Munster, Indiana. When he was one or two blocks from his home, Catt's vehicle crossed the center line and collided with Skeans, who was driving a motorcycle. Catt then left the scene. Shortly thereafter, police officers found Catt at his home and arrested him. He was taken to a local hospital, where a blood test determined that his blood alcohol content was .197 mg/dl.

As a result of the accident, Skeans sustained shoulder fractures that were treated surgically. He had two rods permanently placed in his shoulder and later underwent arduous physical therapy. He also sustained injuries to his back, legs, ankle, knee, head, and chin. He was knocked unconscious and did not regain consciousness until he woke up in the hospital, where he remained for nearly a week. One physician testified that Skeans's shoulder was 35% permanently impaired and that he was limited to light duty work.

At the time of the accident, Skeans was fifty years old and owned and operated his own custom drapery business, which he had started when he was eighteen years old and planned to pass on to his son. He was the business's sole employee and, following the accident, he was unable to operate the business because he cannot do any work that requires him to lift his arm above his head. Thus, he lost all of his clients and the business collapsed. Prior to the accident, Skeans earned $80,000–$100,000 per year. He has not worked in any capacity since the date of the accident.

At some point in time not revealed by the record, Catt pleaded guilty to class C felony operating while intoxicated, receiving a sentence of four years incarceration with two years suspended to probation. This was Catt's third conviction for operating while intoxicated.

On August 5, 2003, the Skeanses filed a complaint against Catt, alleging that Catt was negligent in the operation of his vehicle and that the Skeanses incurred damages as a result. They also contended that Catt acted willfully and wantonly such that punitive damages were warranted. The first trial began on January 30, 2006, and after both parties had rested but before closing arguments had been made, a member of the jury observed Skeans catch a set of keys with his bad arm. On February 1, 2006, the trial court granted the Skeanses' motion for a mistrial over Catt's objection. The retrial began on March 6, 2006, and on March 8, 2006, the jury returned a verdict of $2,001,268.92 in compensatory damages to Skeans, $100,000 in compensatory damages to his wife, Cindy,[1] and $500,000 in punitive damages. Catt now appeals.

## DISCUSSION AND DECISION

### I. Juror Identification

■ Catt first argues that the trial court erroneously refused to divulge the name of the juror who observed Skeans catch a set of keys with his bad arm. Following the presentation of evidence, the trial court called a sidebar conference with counsel and informed them that there was a "major problem," namely, that "[o]ne of the jurors ... saw one of the plaintiffs throw keys to [the] other plaintiff who caught them with the bad arm...." Tr. p. 481. The *Skeanses' attorney* then asked the judge, "[w]hich juror?" to which the

---

1. Catt does not appeal the compensatory damages awarded to Cindy.

trial court responded, "[w]ell, it doesn't matter which juror," and the Skeanses' attorney agreed, "[i]t doesn't. You're right." *Id.* Catt's attorney neither requested the juror's identity nor objected to the judge's refusal to divulge that information. Therefore, it is apparent that Catt has waived this argument.

■ Waiver notwithstanding, we observe that the trial court entered an order on February 1, 2006, in which it identified the juror by number. Given that there were only five remaining jurors—one had previously been dismissed—the juror number should have been sufficient information from which Catt could learn the juror's identity. The trial court did not prohibit the parties from contacting any jurors following the mistrial. At no time did Catt request a continuance in the retrial so that he could hire an investigator or in any way search for the juror. In fact, Catt took no action on this matter until he filed a motion to correct error following the conclusion of the retrial. Consequently, even if the trial court erred in refusing to divulge the juror's name, the error was harmless inasmuch as Catt had sufficient information from which to glean the juror's identity and, in any event, Catt has waived this argument in every possible way.

### II. Punitive Damages

■ Catt next contends that the jury's award of $500,000 in punitive damages is improper. In particular, Catt argues that the trial court should have admitted evidence of his financial circumstances and that the award is unconstitutionally excessive. As to the evidence regarding Catt's finances, we observe that a decision to admit or exclude evidence will not be reversed absent a showing of a manifest abuse of the trial court's discretion. *Strack and Van Til, Inc. v. Carter*, 803 N.E.2d 666, 670 (Ind.Ct.App.2004). The actual punitive damages award, however, is reviewed de novo. *Stroud v. Lints*, 790 N.E.2d 440, 444–45 (Ind.2003).

During Catt's direct examination at trial, his attorney began to ask about his educational background, at which point the Skeanses' attorney objected. At a sidebar conference, Catt's attorney explained that he was "anticipating ... they're going to ask for a substantial verdict...." Tr. p. 427. The trial court sustained the Skeanses' objection, cautioning Catt's counsel, "Don't even go there." *Id.* at 427–28.[2]

■ Catt's attorney proceeded with his direct examination and did not make an offer of proof regarding his client's finances. The failure to make an offer of proof resulted in a waiver of this argument. *Henrichs v. Pivarnik*, 588 N.E.2d 537, 543–44 (Ind.Ct.App.1992).

Catt argues that he did not need to make a formal offer of proof because the substance of the evidence to be offered is apparent from the context of the question. *See* Ind. Evidence Rule 103(a)(2). The only question in the record, however, is "What's your highest level of education?" Tr. p. 427. Even if we infer from that

2. The trial court's frustration likely stems from the fact that on the day before this exchange, Catt had filed a motion in limine, which the trial court granted, seeking to bar "any reference as to the wealth or poverty of the parties as the same is irrelevant." Appellees' App. p. 1. Catt insists that the motion "was intended to keep out improper evidence aimed at provoking sympathy, not proper proof of damages." Reply Br. p. 3. We could easily infer from this motion and the above exchange that occurred at trial that Catt is seeking to have it both ways, but we will give him the benefit of the doubt and assume that his motion in limine was designed to keep out evidence of the parties' finances for the purpose of determining liability rather than calculating damages.

question that Catt's attorney intended to delve into his client's economic circumstances, nothing in the record enlightens us as to the *substance* of Catt's responses. He could be a pauper or he could be a millionaire, we simply have no idea. *Cf. Stroud,* 790 N.E.2d at 445–46 (finding punitive damages were excessive given that defendant was a 17–year–old whose sole source of income was as a participant in a work release program, who had no ability to pay the award, and who had no significant assets). Consequently, we find that Catt has waived this argument by failing to make an offer of proof regarding the substance of his financial circumstances.

 Catt next argues that the punitive damages award is unconstitutionally excessive. In reviewing the amount of punitive damages under the Due Process Clause, we must examine

> "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

*Id.* at 442 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).[3]

 As to the degree of reprehensibility of Catt's conduct, we must consider whether

> the harm caused was physical as opposed to economic; the tortious conduct

evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm,* 538 U.S. at 419, 123 S.Ct. 1513. Catt insists that he did not intentionally harm Skeans. While that may be true, driving with a blood alcohol content of .197 clearly shows an indifference to or a reckless disregard of the health or safety of others. Moreover, Catt had been convicted twice before of this same offense; thus, it was not an isolated incident. The degree of reprehensibility of Catt's conduct, therefore, is rather significant.

As to the actual and potential harm inflicted upon Skeans, we note that he remained in the hospital for a week following the crash. He underwent surgery to have two rods permanently placed in his shoulder and undertook arduous physical therapy as part of his recovery process. He will never regain full use of his right arm and will experience some degree of pain for the rest of his life. As a result of these injuries, Skeans lost the business that he had spent his entire career building and that he had intended to pass on to his son. We can only conclude that these harms inflicted upon Skeans and his family are substantial.

Finally, Catt does not argue that the punitive damages award herein is larger than awards imposed in comparable cases. He merely says that the $500,000 award is

---

3. Catt emphasizes that he has already been punished for his actions by serving his sentence for driving while intoxicated. This fact, however, has no relevance to the factors we must consider when analyzing a punitive damages award—according to *State Farm,* we must focus on the defendant's misconduct, the resulting harm to the plaintiff, and awards in comparable cases. *See also* Ind.Code § 34–24–3–3 ("[i]t is not a defense to an action for punitive damages that the defendant is subject to criminal prosecution for the act or omission that gave rise to the civil action"). Consequently, Catt's incarceration is irrelevant to the propriety of the punitive damages award.

"large in relation to" the $2.1 million in compensatory damages. In *State Farm*, the Supreme Court observed that "single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1." 538 U.S. at 425, 123 S.Ct. 1513. Here, the ratio of punitive damages to compensatory damages is .24 to 1. Under these circumstances, we conclude that the punitive damages award is not unconstitutionally excessive.

### III. Compensatory Damages

 Catt next argues that the compensatory damages award is improper because the Skeans failed to prove lost earning capacity. We will not reverse a damage award so long as the damages are within the scope of the evidence. *Centennial Mortgage, Inc. v. Blumenfeld,* 745 N.E.2d 268, 280 (Ind.Ct.App.2001).

The largest portion of compensatory damages requested by the Skeanses was lost earning potential. During his closing argument, the Skeanses' attorney told the jury that Skeans's "worklife expectancy" was sixteen years, providing the following calculations based on Skeans's prior annual earnings of $80,000 to $100,000:

> 16 years times $80,000 is $1,280,000. 16 years times $90,000 is $1,440,000. And 16 years times $100,000 is $1,600,000. That's the range, gentlemen. That's the evidence. That's the testimony. Somewhere between [$] 80,000 and $100,000, his lost earnings need to come out. He's entitled to those. You should give them to him.

Tr. p. 946.

 The basic measure of damages for lost earning capacity is the difference between the amount the plaintiff was capable of earning before the injury and the amount he was capable of earning thereafter. *Bova v. Gary*, 843 N.E.2d 952, 956 (Ind.Ct.App.2006). Here, there is no dispute regarding Skeans's income potential before the accident—he was earning between $80,000 and $100,000 annually. The dispute herein regards his earning potential *after* the accident. The damages requested by Skeans assume that he is now entirely unable to work. He offered evidence showing that he is no longer able to continue with the same career—he is now unable to hang drapery, inasmuch as he cannot lift his arm over his head. Skeans met his evidentiary burden to support his argument that, in essence, he is now totally incapacitated.[4]

Catt argues that Skeans should be responsible for proving his earning potential following the accident. This argument misses the point, however, inasmuch as Skeans sought damages for full employment incapacity. Catt could have offered expert evidence establishing that, following the accident, Skeans is able to earn a certain salary. He could have argued that Skeans failed to mitigate his damages by declining to find employment following the accident. Catt did not take those actions, however, and may not now rely on his own failure to introduce evidence to reverse a jury award. We also observe the likelihood that a significant portion of the compensatory damages was designed to compensate Skeans for his substantial pain and suffering, which is a portion of the damages that Catt does not challenge. Under these circumstances, we find that the compensatory damages award was within the scope of the evidence.

---

**4.** We observe that the better practice would have been for Skeans to offer evidence of his ability—or inability—to earn an income following the accident. But we will not allow Catt to take advantage of his decision to stand back and fail to offer the same evidence.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and CRONE, J., concur.

### ORDER

On April 4, 2007, the Court handed down its opinion in this appeal marked Memorandum Decision, Not for Publication. The Appellees, by counsel, have filed a Motion for Publication of Opinion. The Appellees request that this Court's opinion be published because it clarifies and harmonizes existing rules of law while also addressing legal issues of substantial public importance.

Having considered the matter, the Court FINDS AND ORDERS AS FOLLOWS:
1. The Appellee's Motion for Publication of Opinion is GRANTED and this Court's opinion heretofore handed down in this cause on April 4, 2007, marked Memorandum Decision, Not for Publication is now ORDERED PUBLISHED.

All panel members concur.